Slip Op. 16 - 59

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SUNEDISON, INC.,<br><br>                    Plaintiff,<br><br>              v.<br><br>UNITED STATES,<br><br>                    Defendant. | Before: Donald C. Pogue,<br>          Senior Judge<br><br>Consol. Court No. 15-00066[1] |

OPINION and ORDER

[remanding Department of Commerce's antidumping duty scope
determination]

Dated: June 14, 2016

        David S. Christy, Jr., Michael P. House, and David J.
Townsend, Perkins Coie LLP, of Washington, DC, for Plaintiff
SunEdison, Inc.

        J. Kevin Horgan and Alexandra H. Salzman, deKieffer
& Horgan, PLLC, of Washington, DC, for Plaintiffs Kyocera Solar,
Inc. and Kyocera Mexicana S.A. de C.V.

        Joshua E. Kurland and Agatha Koprowski, Trial
Attorneys, Commercial Litigation Branch, Civil Division, U.S.
Department of Justice, of Washington, DC, for the Defendant.
Also on the brief were Benjamin C. Mizer, Principal Deputy
Assistant Attorney General, Jeanne E. Davidson, Director, and
Reginald T. Blades, Jr., Assistant Director.  Of counsel was
Scott D. McBride, Senior Attorney, Office of the Chief Counsel
for Trade Enforcement & Compliance, U.S. Department of Commerce,
of Washington, DC.

        Timothy C. Brightbill and Usha Neelakantan,

_____

[1] This action is consolidated with Kyocera Solar, Inc. v. United
States, Ct. No. 15-00081. Order, July 1, 2015, ECF No. 21,
at ¶ 4; Order, Apr. 28, 2016, ECF No. 64.

Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor
SolarWorld Americas, Inc.

**Pogue, Senior Judge:**  This consolidated action arises

from the final affirmative determination made by the U.S.

Department of Commerce ("Commerce") in its antidumping

investigation of certain crystalline silicon photovoltaic

products (solar cells and panels) from Taiwan.[2]  Before the court

are motions for judgment on the agency record, challenging

Commerce's final determinations regarding the scope of these

proceedings.[3]

The court has jurisdiction pursuant to Section

516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended,

19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[4] and 28 U.S.C. § 1581(c)

(2012).

As explained below, Commerce's final scope definition

---

[2] See Certain Crystalline Silicon Photovoltaic Products from
Taiwan, 79 Fed. Reg. 76,966 (Dep't Commerce Dec. 23, 2014)
(final determination of sales at less than fair value) and
accompanying Issues & Decision Mem., A-583-853, Investigation
(Dec. 15, 2014) ("Solar II Taiwan I&D Mem.") cmt. 1.

[3] See Br. of Pl. SunEdison, Inc. in Supp. of Pl.'s Mot. for J.
Upon the Agency R., ECF Nos. 32 (conf. version) & 33 (pub.
version) ("SunEdison's Br."); Kyocera Solar, Inc. & Kyocera
Mexicana S.A. de C.V. Mem. in Supp. of Mot. for J. on the
Agency R., ECF Nos. 29 (conf. version) & 30 (pub. version)
("Kyocera's Br.").

[4] Further citations to the Tariff Act of 1930, as amended, are to
the relevant provisions of Title 19 of the U.S. Code, 2012
edition.

is remanded for consistency with, and based on the same
reasoning as, related proceedings concerning solar panels from
the People's Republic of China ("China" or "PRC").[5]  Essentially,
Commerce's final scope determination, in both cases, treated
solar panels differently depending on their country of assembly,
and failed to consider or discuss either the proportion of
production necessary to determine a solar panel's country of
origin or the reasonableness of applying duties to the entire
value of solar panels assembled in the PRC when only a small
percentage of the cost of production actually occurs there.

        After a statement of the background, arguments
presented, and standard of review, the Plaintiffs' challenges to
Commerce's final scope determination are discussed below.

                            **BACKGROUND**

        Relevant background leading to this case is summarized
in the court's prior opinion.[6]  Briefly, the <u>Solar II PRC</u> opinion
addressed Commerce's scope determinations in related proceedings
concerning solar panels from China that are assembled from cells

---

[5] <u>See</u> <u>SunPower Corp. v. United States</u>, Slip Op. 16-56,
Consol. Ct. No. 15-00067, ECF No. 98, (June 8, 2016)
("<u>Solar II PRC Slip Op.</u>" or "the <u>Solar II</u> opinion");
<i>infra</i> Discussion Sections IV, VI, & VII.

[6] <u>Solar II PRC Slip Op.</u>, Slip Op. 16-56,
Consol. Ct. No. 15-00067, ECF No. 98, at Background Sections I
& II.

manufactured outside of China,[7] including specifically cells that were manufactured in Taiwan (the "Solar II PRC" proceedings).[8] Commerce's final scope definition here (in the "Solar II Taiwan" proceedings) covers all solar cells manufactured in Taiwan that are assembled into panels anywhere in the world, except those covered by the Solar II PRC proceedings because they are assembled into panels in China.[9]  Both cases concern the rules of origin for solar panels manufactured from Taiwanese cells.  For this reason, the issues here are inextricably entwined with those already addressed in the Solar II PRC opinion. Familiarity with the Solar II PRC opinion is therefore presumed.

        Solar panels assembled from solar cells made in the PRC were also, and initially, the subject of separate proceedings (the "Solar I PRC" proceedings).  The Solar I PRC proceedings resulted in antidumping and countervailing duty orders covering all solar cells manufactured in China, whether or not and regardless of where in the world such cells are

---

[7] Solar panels (also referred to as modules or laminates) are assembled from solar cells, which use crystalline silicon to convert sunlight into electricity. Certain Crystalline Silicon Photovoltaic Products from China and Taiwan, USITC Pub. 4519, Inv. Nos. 701-TA-511 & 731-TA-1246-1247 (Feb. 2015) (final determination) ("Solar II ITC Final Determination") at 10.

[8] Solar II PRC Slip Op., Slip Op. 16-56, Consol. Ct. No. 15-00067, ECF No. 98, at Background Section II & Discussion Section IV.

[9] See Solar II Taiwan I&D Mem. cmt. 1 at 23.

assembled into solar panels prior to exportation to the United
States.[10]

        In the Solar I PRC proceedings, Commerce determined
that "solar module assembly does not substantially transform
solar cells such that it changes the country-of-origin."[11]
Accordingly, Commerce concluded that "where solar cell
production occurs in a different country from solar module
assembly, the country-of-origin of the solar modules/panels is
the country in which the solar cell was produced [and not the
country of panel assembly]."[12]

───────────────

[10] See Crystalline Silicon Photovoltaic Cells, Whether or Not
Assembled into Modules, from the [PRC], 77 Fed. Reg. 63,791
(Dep't Commerce Oct. 17, 2012) (final determination of sales
at less than fair value, and affirmative final determination of
critical circumstances, in part) and accompanying Issues
& Decision Mem., A-570-979, Investigation (Oct. 9, 2012)
("Solar I PRC AD I&D Mem."); Crystalline Silicon Photovoltaic
Cells, Whether or Not Assembled into Modules, from the [PRC],
77 Fed. Reg. 63,788 (Dep't Commerce Oct. 17, 2012) (final
affirmative countervailing duty determination and final
affirmative critical circumstances determination) and
accompanying Issues & Decision Mem., C-570-980, Investigation
(Oct. 9, 2012); Solar II PRC Slip Op., Slip Op. 16-56,
Consol. Ct. No. 15-00067, ECF No. 98, at Background Section I.

[11] [Commerce's] Mem. re Scope Clarification, Crystalline Silicon
Photovoltaic Cells, Whether or Not Assembled into Modules, from
the [PRC], A-570-979 & C-570-980, Investigations (Mar. 19,
2012), reproduced in, e.g., App. to Br. of Consol. Pl. Suniva,
Inc. in Supp. of its Mot. for J. on the Agency R., Consol. Ct.
No. 15-00067, ECF No. 58-3 at Tab 1 Ex. 2 ("Solar I PRC Scope
Clarification Mem."), at 8 (unchanged in Solar I PRC AD I&D Mem.
cmt. 1 at 6-7).

[12] Id.

Following the imposition of the Solar I PRC orders,
however, domestic producer SolarWorld Americas Incorporated
("SolarWorld") (now Defendant-Intervenor in this action)
petitioned Commerce to initiate additional proceedings.
SolarWorld alleged, *inter alia*, that after the Solar I PRC
orders were imposed, exports of solar panels to the United
States from China shifted from panels assembled from cells that
were also made in China, to panels assembled from cells
"completed or partially manufactured in Taiwan or other
countries (i.e., cells manufactured in Taiwan from Taiwanese
inputs, or cells manufactured in Taiwan or other countries from
Chinese inputs, including wafers)."[13]

Commerce agreed that this "measurable shift in trade
flows . . . resulted in increased imports of non-subject modules
produced in China."[14]   In response, Commerce initiated

---

[13] Pet. for Imposition of Antidumping & Countervailing Duties
Pursuant to Secs. 701 & 731 of the Tariff Act of 1930, as
Amended, Certain Crystalline Silicon Photovoltaic Products from
the [PRC] and Taiwan, A-570-010, A-583-853, & C-570-011
Investigations (Dec. 31, 2013), reproduced in App. to Def.'s
Resp. in Opp'n to Pls.' Rule 56.2 Mots. for J. on the Agency R.,
ECF Nos. 53-1 (conf. version) & 54-1 (pub. Version) at Tab 1
("Solar II Pet."), at 5-6.

[14] Solar II Taiwan I&D Mem. cmt. 1 at 21 (citing Solar II Pet.,
[ECF Nos. 53-1 & 54-1 at Tab 1], at 3, 5-6, 21, 34, 37, 53);
see also id. at 17 ("[SolarWorld's Solar II] Petition claimed
that Chinese solar producers were 'using cells fully or
partially manufactured in Taiwan in the modules they assembled
for export to the United States,' which allowed the Chinese
                                        (footnote continued)

(1) antidumping and countervailing duty investigations that ultimately resulted in orders covering all panels assembled in China from solar cells made outside of China, including Taiwanese cells[15] (the Solar II PRC proceedings); and (2) an antidumping investigation that ultimately resulted in an order covering all solar cells produced in Taiwan, whether or not, and regardless of where, assembled into panels, except those assembled into panels in China[16] (the Solar II Taiwan proceedings).

Plaintiffs here[17] are U.S. importers and a foreign producer of solar panels containing solar cells manufactured in Taiwan.[18]  Plaintiffs now challenge Commerce's final

---

solar producers to 'export those modules, duty-free, to the U.S. market.'  . . .  The Petition claimed that Taiwanese cell and module imports increased by 85 percent, in large part as a result of this alleged loophole.") (quoting and citing, respectively, Solar II Pet., [ECF Nos. 53-1 & 54-1 at Tab 1], at 4, 6); id. at 21 ("[F]ollowing the implementation of the [Solar I PRC] AD and CVD orders . . ., there has been a measurable shift in trade flows that has resulted in increased imports of non-subject modules produced in China.") (citing Solar II Pet., [ECF Nos. 53-1 & 54-1 at Tab 1], at 3, 5-6, 21, 34, 37, 53).

[15] See Solar II PRC Slip Op., Slip Op. 16-56, Consol. Ct. No. 15-00067, ECF No. 98, at Background Section II & Discussion Section IV).

[16] See Solar II Taiwan I&D Mem. cmt. 1 at 23.

[17] SunEdison, Inc. ("SunEdison"), and Kyocera Solar, Inc. and Kyocera Mexicana S.A. de C.V. (collectively "Kyocera").

[18] Compl., ECF No. 11, at ¶ 5; see Compl., Ct. No. 15-00081,

(footnote continued)

determination regarding the scope of the Solar II Taiwan
proceedings.  Specifically, the Plaintiffs make the following
arguments regarding Commerce's final scope determination in the
Solar II Taiwan investigation.

## PARTIES' ARGUMENTS

(I) Commerce's late modification of the Solar II
Taiwan scope substantially deprived interested parties –
including Kyocera, a Mexican assembler of Taiwanese solar cells
into panels exported to the United States – of due process.[19]

(II) Commerce unlawfully expanded the scope of
Solar II Taiwan, after the close of factual submissions, to
include merchandise that had been excluded from Commerce's
unfair pricing analysis (as well as the International Trade

---

ECF No. 6, at ¶¶ 5-6, 9, 17.

[19] See Kyocera's Br., ECF Nos. 29 & 30, at 3 (describing
Kyocera's production structure), 24-25 (arguing that Commerce's
approach to scope definition throughout this investigation
deprived Kyocera of due process); see also SunEdison's Br.,
ECF Nos. 32 & 33, at 28 ("[Commerce] deprived respondents of the
opportunity to comment on the novel scope adopted in the final
determination by issuing it so late in the proceeding."); 
id. at 9 ("[Commerce] did not address any of the comments
opposing [its ultimate] scope proposal . . ., even though it
adopted in its final determination virtually all of [that]
proposal with respect to Taiwan.").

Commission's injury analysis) throughout the investigations.[20]

(III) Commerce's final <u>Solar II Taiwan</u> scope
determination was contrary to explicit statutory and regulatory
requirements.[21]  Specifically, Plaintiffs argue that Commerce's
final <u>Solar II Taiwan</u> scope determination was contrary to one or
more of the following statutory/regulatory provisions:
(A) 19 U.S.C. § 1673 (providing Commerce's authority to impose
antidumping duties on products within "a class or kind of
foreign merchandise");[22] (B) 19 U.S.C. §§ 1677b(a) (requiring a
"fair comparison" between prices of the foreign like product

---

[20] <u>See</u> SunEdison's Br., ECF Nos. 32 & 33, at 28 ("In reporting
U.S. sales in their questionnaire responses, Commerce instructed
the Taiwan respondents to follow . . . a scope definition that
Commerce totally abandoned [in the final determination,] long
after verifications of those responses were completed . . . .");
<u>id.</u> at 26 ("In <u>Allegheny Bradford</u>, this Court explained that
'Commerce's discretion to define and clarify the scope of an
investigation is limited in part by concerns for the finality of
administrative action, which caution against including a product
that was understood to be excluded at the time the investigation
began.'") (quoting <u>Allegheny Bradford Corp. v. United States</u>,
28 CIT 830, 342 F. Supp. 2d 1172, 1187-88 (2004) (citation
omitted)); Kyocera's Br., ECF Nos. 29 & 30, at 7 ("[Commerce]'s
attempt to expand the [final] scope of the [<u>Solar II Taiwan</u>]
investigation comes too late.  The [prior] scope ha[d] not only
been used in [Commerce]'s selection of mandatory respondents, it
has also defined the scope of the International Trade
Commission's injury investigation . . . .") (quoting Kyocera's
administrative case brief below).

[21] SunEdison's Br., ECF Nos. 32 & 33, at 14-16, 21-24; Kyocera's
Br., ECF Nos. 29 & 30, at 11-16.

[22] SunEdison's Br., ECF Nos. 32 & 33, at 12-14; 19 U.S.C. § 1673.

from the country under investigation (normal value) and the U.S. export prices of the subject merchandise) & 1677(16)(A)-(C) (requiring that the "foreign like product" must be "produced in the same country" as the subject merchandise);[23] (C) 19 U.S.C. § 1677j(b) (dealing with circumvention of existing antidumping duty orders) & 19 C.F.R. § 351.225(h) (providing for Commerce's issuance of scope rulings, under existing antidumping duty orders, for "products completed or assembled in other foreign countries").[24]  SunEdison also argues that, (D) "by enacting and revising the antidumping law in 1984, 1988 and 1994, Congress bound Commerce to [continue to] use the substantial transformation test to determine the scope of antidumping duty orders . . . ."[25]

   (IV) Commerce's final Solar II Taiwan scope determination unlawfully departed from prior practice without

---

[23] SunEdison's Br., ECF Nos. 32 & 33, at 14-15.

[24] Kyocera's Br., ECF Nos. 29 & 30, at 11-16.

[25] SunEdison's Br., ECF Nos. 32 & 33, at 21 (relying on GPX Int'l Tire Corp. v. United States, 666 F.3d 732, 739 (Fed. Cir. 2011) ("In the case of a widely known judicial decision or agency practice, 'Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.'") (quoting Lorillard v. Pons, 434 U.S. 575, 580 (1978)); id. at 21-25 (expanding on this argument).

sufficient explanation.[26]

(V) Commerce's conclusion that, with the exception of Taiwanese cells assembled into solar panels in China, all panels assembled from Taiwanese cells are subject to the Solar II Taiwan proceedings as products of Taiwan, regardless of where they are assembled, is not supported by substantial evidence.[27] Specifically, Commerce's determination that Taiwanese solar cells are not substantially transformed when assembled into panels in Mexico is unreasonable in light of the evidentiary record.[28]

(VI) Commerce unreasonably determined to apply antidumping duties on the full value of the panels into which Taiwanese solar cells are incorporated, rather than solely the value of the cells themselves.[29]

(VII) Commerce unreasonably excluded from its final dumping analysis third-country sales that the mandatory respondents reported as ultimately destined for the United

---

[26] SunEdison's Br., ECF Nos. 32 & 33, at 12-13, 21.

[27] Kyocera's Br., ECF Nos. 29 & 30, at 7, 18-23.

[28] See id.; infra Standard of Review Section (defining "substantial evidence" review).

[29] SunEdison's Br., ECF Nos. 32 & 33, at 10, 54-56; Kyocera's Br., ECF Nos. 29 & 30, at 8, 15-16, 25-26.

States.[30]

     Following a statement of the applicable standard of

review, each group of arguments is addressed in turn below.

### STANDARD OF REVIEW

     The court will sustain Commerce's antidumping

determinations if they are supported by substantial evidence and

are otherwise in accordance with law.[31]  Substantial evidence

refers to "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion,"[32] considering any

relevant evidence that fairly detracts from the reasonableness

of the agency's determination.[33]  The substantial evidence

standard of review can be roughly translated to mean "is the

determination unreasonable?"[34]  The agency must "examine the

relevant data and articulate a satisfactory explanation for its

---

[30] SunEdison's Br., ECF Nos. 32 & 33, at 4-6, 27, 33-40.

[31] See 19 U.S.C. § 1516a(b)(1)(B)(i).

[32] SKF USA, Inc. v. United States, 537 F.3d 1373, 1378
(Fed. Cir. 2008) (quoting Consol. Edison Co. v. NLRB, 305 U.S.
197, 229 (1938)).

[33] Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

[34] Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351
(Fed. Cir. 2006) (quotation and alteration marks and citation
omitted).

action,"[35] including "a 'rational connection between the facts

found and the choice made.'"[36]

        "[A]n agency determination that is arbitrary is *ipso*

*facto* unreasonable,"[37] and a determination is arbitrary when it

fails to "consider an important aspect of the problem,"[38] or

"treat[s] similar situations in dissimilar ways."[39]

---

[35] <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.</u>,
463 U.S. 29, 43 (1983).

[36] <u>Id.</u> (quoting <u>Burlington Truck Lines v. United States</u>, 371 U.S.
156, 168 (1962)).

[37] <u>Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States</u>,
__ CIT __, __ F. Supp. 3d __, Slip Op. 16-11, 2016 WL 524268,
at *17 n.148 (Feb. 9, 2016) (quoting <u>Ward v. Sternes</u>, 334 F.3d
696, 704 (7th Cir. 2003) ("[A] decision [that] is so
inadequately supported by the record as to be arbitrary [is]
therefore objectively unreasonable.") (quotation marks and
citations omitted)).

[38] <u>State Farm</u>, 463 U.S. at 43.

[39] <u>Anderson v. U.S. Sec'y of Agriculture</u>, 30 CIT 1742, 1749, 462
F. Supp. 2d 1333, 1339 (2006) ("Agencies have a responsibility
to administer their statutorily accorded powers fairly and
rationally, which includes not 'treat[ing] similar situations
in dissimilar ways.'") (quoting <u>Burinskas v. NLRB</u>, 357 F.2d 822,
827 (D.C. Cir. 1966) ("[An agency] cannot act arbitrarily nor
can it treat similar situations in dissimilar ways.") (citation
and footnote omitted)); <u>see also</u> <u>id.</u> ("Indeed, a principal
justification for the administrative state is that in 'areas of
limitless factual variations, like cases will be treated
alike.'") (quoting <u>Nat'l Muffler Dealers Ass'n v. United States</u>,
440 U.S. 472, 477 (1979) (citations omitted)) (also quoting
<u>South Shore Hosp., Inc. v. Thompson</u>, 308 F.3d 91, 101
(1st Cir. 2002) ("The goal of regulation is not to provide exact
uniformity of treatment, but, rather, to provide uniformity of
rules so that those similarly situated will be treated
alike."));  <u>Trs. in Bankruptcy of N. Am. Rubber Thread Co.
v. United States</u>, 32 CIT 663, 665, 558 F. Supp. 2d 1367, 1370
                                        (footnote continued)

Where the statutory language is sufficiently broad to permit a range of policy choices, the agency may change course from its prior practice and adopt a new approach within its statutory authority,[40] but it must explain how the new policy is consistent with the continued relevance (if any) of the factual findings on which the agency's prior policy was based.[41] "[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior

---

(2008) ("Generally, an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.") (quotation and alteration marks and citation omitted).

[40] See, e.g., Nakornthai Strip Mill Pub. Co. v. United States, 32 CIT 1272, 1276, 587 F. Supp. 2d 1303, 1307 (2008) ("Commerce has discretion to change its policies and practices as long as they are reasonable and consistent with their statutory mandate and may adapt its views and practices to the particular circumstances at hand, so long as the agency's decisions are explained and supported by substantial evidence on the record.") (quotation and alteration marks and citation omitted).

[41] See British Steel PLC v. United States, 127 F.3d 1471, 1475 (Fed. Cir. 1997) ("An agency is obligated to follow [its] precedent, and if it chooses to change, it must explain why.") (quotation marks and citation omitted); State Farm, 463 U.S. at 46-48 (holding that an agency may not change course without addressing the continued relevance of factual findings on which the agency's prior policy was based); FCC v. Fox Television Stations, Inc., 556 U.S. 502, 537 (2009) (J. Kennedy, concurring in part and concurring in judgment) (explaining that State Farm followed the principle that an agency "cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate").

policy."[42]   Thus, "when departing from its own precedent,

Commerce must explain its departure,"[43] providing a rational link

between the facts found and the conclusions reached, after

considering all important aspects of the problem.

### DISCUSSION

I.   Remand on Other Grounds Makes Reaching Due Process
     Arguments Unnecessary.

        Because remand of Commerce's final <u>Solar II Taiwan</u>

scope determinations is warranted on other grounds,[44] and because

the parties will therefore have ample opportunity to address the

scope issues on remand, Plaintiffs' due process challenges to

the final scope determination are moot.   The court therefore

offers no opinion in this regard.

        In addition, Kyocera's claim that, as a third-country

assembler of Taiwanese solar cells into panels, it was deprived

of its "right to participate in the investigation as a

respondent and submit information demonstrating that it was not

---

[42] <u>Fox</u>, 556 U.S. at 516.

[43] <u>Nakornthai</u>, 32 CIT at 1276, 587 F. Supp. 2d at 1308 (citing
and quoting <u>Trs. in Bankruptcy of N. Am. Rubber Thread Co.
v. United States</u>, 31 CIT 2040, 2047, 533 F. Supp. 2d 1290, 1297
(2007) ("Commerce [must] attempt to distinguish the reasoning
set forth in [prior cases] from the present case.") (alterations
in <u>Nakornthai</u>)).

[44] <u>See</u> *infra* Discussion Section IV.

dumping solar products"[45] is entwined with the scope

determinations remanded here and in Solar II PRC.[46]  Accordingly,

this matter will be clarified once the issues remanded here are

resolved, and the scope of these proceedings is finalized.

II.  Commerce's Final *Solar II Taiwan* Scope Modification's
     Effect On the Databases Used Throughout the Investigation

         Plaintiffs next argue that Commerce's final Solar II

Taiwan scope determination unlawfully altered the sales

databases relied on throughout the investigation, resulting in

incongruence between the sales used to determine dumping

liability and those ultimately covered by the order.[47]  Because

---

[45] Kyocera's Br., ECF Nos. 29 & 30, at 25.

[46] See *infra* Discussion Sections IV, VI, & VII; Solar II PRC Slip
Op., Slip Op. 16-56, Consol. Ct. No. 15-00067, ECF No. 98,
at Discussion Section IV.

[47] See SunEdison's Br., ECF Nos. 32 & 33, at 28 ("In reporting
U.S. sales in their questionnaire responses, Commerce instructed
the Taiwan respondents to follow . . . a scope definition that
Commerce totally abandoned long after verifications of those
responses were completed . . . ."); id. at n.14 (noting that in
Solar II PRC Commerce had emphasized that its final scope
modification "'result[ed] in no change to [the mandatory
respondents'] reported database[s]'") (quoting Issues & Decision
Mem., Certain Crystalline Silicon Photovoltaic Products from the
[PRC], A-570-010, Investigation (Dec. 15, 2014) (adopted in
79 Fed. Reg. 76,970 (Dep't Commerce Dec. 23, 2014) (final
determination of sales at less than fair value)) ("Solar II PRC
AD I&D Mem.") cmt. 1 at 19); Kyocera's Br., ECF Nos. 29 & 30,
at 7 (quoting Kyocera's administrative case brief below
("[Commerce's scope modification changed the scope from that]
used in [Commerce]'s selection of mandatory respondents [and]
. . . the International Trade Commission's injury investigation,
which has undertaken no analysis of the impact of third-country
                                         (footnote continued)

this claim also implicates the specific agency decisions that
are remanded here and in Solar II PRC,[48] the court also defers
consideration of this matter until the issues remanded here are
resolved, and the scope of these proceedings is finalized.


III. Commerce's Final *Solar II Taiwan* Scope Determination Was
     Not Contrary to Explicit Statutory and Regulatory
     Requirements.

        Next, Plaintiffs argue that Commerce's final Solar II
Taiwan scope determination was contrary to one or more
statutory/regulatory provisions.[49]   Each argument is addressed in
turn.

-------------------------------------------------------------

solar modules on the domestic industry.")); but see Solar II ITC
Final Determination, *supra* note 7, at 7 ("The [International
Trade] Commission recognized early in these [Solar II PRC and
Solar II Taiwan] investigations that changes in the scopes were
likely and took steps to ensure that it collected the
information that would allow it to fulfill its statutory
obligations.  In the questionnaires issued in the final phase of
these investigations, the Commission asked U.S. producers and
importers to segregate their import data into sixteen
categories, which were designed to provide the Commission with
flexibility to adjust the data to conform to different possible
scope definitions.  The manner in which the Commission collected
the data in these investigations permitted the agency and the
parties to consider and evaluate the implications of various
possible scope definitions to the Commission's analysis.")
(citations omitted).

[48] See *infra* Discussion Sections IV, VI, & VII; Solar II PRC
Slip Op., Slip Op. 16-56, Consol. Ct. No. 15-00067, ECF No. 98,
at Discussion Section IV.

[49] See *supra* notes 21-25 and accompanying text.

*A. 19 U.S.C. § 1673*

SunEdison argues that Commerce impermissibly "assigned to [the statutory phrase] 'a class or kind of foreign merchandise' different and inconsistent meanings for the same merchandise – modules containing Taiwanese-origin cells – depending on where the module assembly took place."[50]

But as explained in the Solar II PRC opinion, it is well-established that the scope of an antidumping order is defined by two *separate* inquiries – (1) is the product within the relevant class/kind of merchandise? and (2) did the product originate in the country covered by the order?[51]  Here, the relevant class/kind of merchandise is solar cells, whether or not assembled into panels.[52]  The essence of the parties' dispute concerns the second inquiry – Commerce's rule for determining whether a given product within this class/kind of merchandise originates in the country covered by the order.  Commerce did

---

[50] SunEdison's Br., ECF Nos. 32 & 33, at 14 (quoting 19 U.S.C. § 1673).

[51] Solar II PRC Slip Op., Slip Op. 16-56, Consol. Ct. No. 15-00067, ECF No. 98, at 25 (quoting and citing relevant authorities).

[52] See Solar II Taiwan I&D Mem. Section III (Scope of the Investigation) at 4 ("The merchandise covered by this investigation is crystalline silicon photovoltaic [i.e., solar] cells, and modules, laminates and/or panels consisting of [such] cells, whether or not partially or fully assembled into other products, including building integrated materials.").

not assign different and inconsistent meanings to the phrase

"class or kind of foreign merchandise" in 19 U.S.C. § 1673, but

rather applied two different origin rules to products within

this class or kind of merchandise, depending on where the solar

cells were assembled into panels.[53]  Because the statute does not

directly address this concern, Commerce's decision in this

regard was not explicitly contrary to the plain language of

19 U.S.C. § 1673.

   B.    *19 U.S.C. § 1677b(a) & 1677(16)(A)-(C)*

        SunEdison also argues that, because "[t]he statute

defines the term 'country' as limited to a single country for

purposes of antidumping proceedings,"[54] it therefore "compels a

uniform test to determine when the foreign like product is

'produced in the same country' as subject merchandise, because

multiple tests arbitrarily create a mismatch between the

universes [i.e., respective scopes] of subject merchandise and

the foreign like product."[55]  Because this claim is related to

---

[53] See *infra* Discussion Section IV; Solar II PRC Slip Op.,
Slip Op. 16-56, Consol. Ct. No. 15-00067, ECF No. 98,
at Discussion Section IV.

[54] SunEdison's Br., ECF Nos. 32 & 33, at 14-15 (quoting 19 U.S.C.
§ 1677(3)).

[55] Id. (quoting 19 U.S.C. § 1677(16)) (also citing and quoting
Slater Steels v. United States, 27 CIT 1786, 1788, 297 F. Supp.
2d 1362, 1364 (2003) ("Under any of these definitions [of normal
value], both the 'foreign like product' and the 'subject
                                      (footnote continued)

one of the grounds for remand, both here and in <u>Solar II PRC</u>,[56]
the court will defer its adjudication of this issue until the
agency has had an opportunity to reconsider on remand.

    *C.   19 U.S.C. § 1677j(b) & 19 C.F.R. § 351.225(h)*

    Next, Kyocera argues that Commerce's decision – to
include, within the scope of this order on merchandise from
Taiwan, all Taiwanese solar cells that are assembled into panels
in Taiwan or in other countries (except those that are assembled
into panels in China) – should be evaluated under 19 U.S.C.
§ 1677j(b) (dealing with circumvention of existing antidumping
duty orders) and 19 C.F.R. § 351.225(h) (providing for
Commerce's issuance of scope rulings, under existing antidumping
duty orders, for "products completed or assembled in other
foreign countries").[57]

    As Kyocera acknowledges, however, these provisions
apply to circumstances where an order with a defined scope is
already in effect,[58] whereas here Commerce was defining the scope

---

merchandise' must be in the same country as the merchandise that
is the subject of the investigation.") (footnote omitted).

[56] <u>See</u> *infra* Discussion Sections IV & VI; <u>Solar II PRC Slip Op.</u>,
Slip Op. 16-56, Consol. Ct. No. 15-00067, ECF No. 98,
at Discussion Section IV.

[57] Kyocera's Br., ECF Nos. 29 & 30, at 11-16.

[58] <u>See</u> <u>id.</u> at 14; 19 U.S.C. § 1677j(b)(1)(A)(i) (providing that
this provision applies to "merchandise imported into the United
States [that] is of the same class or kind as any merchandise
(footnote continued)

of an order prior to its imposition.  Although Kyocera argues

that this distinction is immaterial,[59] the distinction is in fact

significant.  Here, Commerce is fashioning the foundational

scope of a proceeding, before the imposition of the order,

rather than extending an existing order to cover new merchandise

so as to address circumvention of an order's pre-existing scope.

19 U.S.C. § 1677j(b) and 19 C.F.R. § 351.225(h) are therefore

inapposite to the specific issues presented here.

> D.   *Congress Did Not Bind Commerce To Always Use The*
>      *Substantial Transformation Test To Establish the*
>      *Origin of Products Manufactured in Multiple Countries.*

Finally, Congress did not require Commerce to continue

to use its substantial transformation test[60] when determining the

---

produced in a foreign country that is the subject of . . . *an antidumping duty order [that is already] issued*") (emphasis added); 19 C.F.R. § 351.225(h) (noting that this regulatory provision applies once an antidumping duty order "is [already] in effect").

[59] See Kyocera's Br., ECF Nos. 29 & 30, at 14 (arguing that "the same reasoning applies" regardless of whether Commerce is initially establishing an origin rule for a class of merchandise in which products are manufactured in more than one country, or whether the agency is subsequently asked to cover additional merchandise that was not previously covered by the origin rule initially established).

[60] See *infra* Discussion Section V (discussing Commerce's substantial transformation test); Solar II Taiwan I&D Mem. cmt. 1 at 19-23 (applying the substantial transformation test to determine the origin of all panels assembled from solar cells made outside the country-of-assembly, except panels assembled in China); Solar II PRC Slip Op., Slip Op. 16-56, Consol. Ct. No. 15-00067, ECF No. 98, at Background Sections I & II, and
                                         (footnote continued)

origin of (and hence the appropriate foreign market for
calculating the comparison normal values for) merchandise
manufactured in multiple countries.[61]  Because the plain language
of the antidumping statute does not unambiguously prescribe any
specific approach to origin determinations, Commerce may
exercise reasonable discretion in selecting a reasonable method
for such determinations.[62]  Thus even if SunEdison were correct
that, by revisiting the antidumping law without explicitly
rejecting Commerce's prior use of the substantial transformation
test to determine the origin of products made in multiple
countries, Congress ratified the agency's use of this test,[63] it
does not follow that the agency is therefore *required* to always
exercise its discretion in the same way.  That Congress did not
reject the agency's particular exercise of discretion is not
equivalent to a requirement that the agency must always exercise

---

Discussion Section IV (providing additional background and
discussion).

[61] See SunEdison's Br., ECF Nos. 32 & 33, at 21-25 (making the
argument that "Congress bound Commerce to use the substantial
transformation test to determine the scope of [all] antidumping
duty orders").

[62] See *supra* Standard of Review Section.

[63] See SunEdison's Br., ECF Nos. 32 & 33, at 21-25 (making this
argument).

its discretion using the same method.[64]

IV.  Commerce's Final *Solar II Taiwan* Scope Determination Is
     Remanded for Consistency with the *Solar II PRC* Proceedings.

        Next, SunEdison argues that Commerce's final Solar II

Taiwan scope determination unlawfully departed from prior

practice without sufficient explanation.[65]  Both here in Solar II

Taiwan and in Solar II PRC, Commerce established two different

origin rules for solar panels, depending on where they are

assembled.[66]  As this Court has already ruled with regard to the

_____

[64] See, e.g., Nakornthai, 32 CIT at 1276, 587 F. Supp. 2d at 1307
("Commerce has discretion to change its policies and practices
as long as they are reasonable and consistent with their
statutory mandate and may adapt its views and practices to the
particular circumstances . . . at hand, so long as the agency's
decisions are explained and supported by substantial evidence on
the record.") (quotation and alteration marks and citation
omitted).  SunEdison's argument regarding the Statement of
Administrative Action ("SAA"), SunEdison's Br., ECF Nos. 32
& 33, at 24 (arguing that the SAA requires Commerce to always
use the substantial transformation test to determine the origin
of products manufactured in multiple countries) (quoting Uruguay
Round Agreements Act, SAA, H.R. Doc. No. 103-316 (1994) at 844,
reprinted in 1994 U.S.C.A.A.N. 4040 ("Outside of a situation
involving circumvention of an antidumping duty order, a
substantial transformation of a good in an intermediate country
would render the resulting merchandise a product of the
intermediate country rather than the original country of
production.")), is unpersuasive for the same reason.  That the
SAA accepts "substantial transformation" as *sufficient* to
determine country-of-origin does not mean that it requires this
test as *necessary* for that purpose.

[65] See SunEdison's Br., ECF Nos. 32 & 33, at 12-13, 21-22.

[66] See Solar II Taiwan I&D Mem. cmt. 1 at 23 ("[S]olar modules
assembled in the PRC using Taiwanese cells are within the scope
of, and therefore subject to, the [Solar II PRC] investigations
                                        (footnote continued)

Solar II PRC proceedings, in doing so, Commerce did not provide
sufficient explanation for (1) departing from the agency's prior
practice of establishing a single consistent origin rule for all
products within a single class or kind of merchandise;
(2) treating similarly-situated products differently; and
(3) departing from the agency's prior practice of calculating
the foreign like product's normal value in the market where the
majority of production of the subject merchandise took place.[67]

Because the final Solar II Taiwan scope incorporates
the Solar II PRC exception for solar panels assembled in China –
which exempts all such panels from the otherwise generally-
applicable rule that the origin of solar panels is determined by
the origin of their constituent cells[68] – these same concerns are
also implicated here.[69]  Accordingly, Commerce's final Solar II

---

as Chinese modules . . . .  This is in contrast to cells from
Taiwan which are used in the assembly of solar modules in other
countries . . ., [which] are considered Taiwanese in origin, and
are within the scope of this [Solar II Taiwan] investigation.")
(footnote omitted); Solar II PRC Slip Op., Slip Op. 16-56,
Consol. Ct. No. 15-00067, ECF No. 98, at Background Section II
& Discussion Section IV.

[67] Solar II PRC Slip Op., Slip Op. 16-56, Consol. Ct.
No. 15-00067, ECF No. 98, at Discussion Section IV.

[68] See, e.g., Solar II Taiwan I&D Mem. cmt. 1 at 24 ("[T]he solar
cell determines the country of origin, unless manufactured into
a module, laminate or panel in the PRC.").

[69] The Government's additional reliance here on Certain Softwood
Lumber Products from Canada, 67 Fed. Reg. 15,545 (Dep't Commerce
Apr. 2, 2002) (notice of final affirmative countervailing duty
(footnote continued)

<u>Taiwan</u> scope determination must be remanded for the same reasons

as those elaborated in the court's prior opinion,[70] to ensure

that the agency's approach in these proceedings is consistent.

---

determination and final negative critical circumstances
determination) ("<u>Softwood Lumber from Canada</u>"), in support of
the proposition that "[s]uch exclusions [as the exception from
the general origin rule for panels assembled in China] are
common," Def.'s Resp. in Opp'n to Pls.' Rule 56.2 Mots. for J.
on the Agency R., ECF Nos. 44 (conf. version) & 45 (pub.
version), at 33 (citing <u>Softwood Lumber from Canada</u>, 67 Fed.
Reg. at 15,547), is unpersuasive.  In that case, Commerce
exempted softwood lumber products made in certain Canadian
Provinces (referred to as the "Maritime Provinces") from its
countervailing duty investigation, <u>Softwood Lumber from Canada</u>,
67 Fed. Reg. at 15,547 (citing <u>Certain Softwood Lumber Products</u>
<u>from Canada</u>, 66 Fed. Reg. 40,228 (Dep't Commerce Apr. 2, 2001)
(amendment to the notice of initiation of countervailing duty
investigation)), due to "unique circumstances," 66 Fed. Reg.
at 40,228.  Specifically, Commerce explained that "[t]hroughout
much of the history of this dispute, the Maritime Provinces have
been exempt from the various actions taken," and that (unlike
here, with regard to solar panels) "[a]ll parties have generally
recognized that there are unique circumstances associated with
the Maritime Provinces and have supported those exemptions." <u>Id.</u>
at 40,229.  Thus not only was the exemption uncontested and
non-controversial (unlike here), the <u>Softwood Lumber from Canada</u>
example is in any event inapposite to the issue presented here
and in <u>Solar II PRC</u> with respect to the multiple origin rules
established for solar panels.  Here the issue is not (as in
<u>Softwood Lumber from Canada</u>) that some products were exempted
from antidumping/countervailing duty liability (for whatever
political reasons), but rather that some products within the
class or kind of merchandise are treated using a different rule
than that which is otherwise generally applicable to products
within that overall class/kind.  <u>Softwood Lumber from Canada</u> is
not an example of a case where the agency has established two
different national origin rules for products within the same
class or kind of merchandise.

[70] <u>See</u> <u>Solar II PRC Slip Op.</u>, Slip Op. 16-56, Consol. Ct. No. 15-
00067, ECF No. 98, at Discussion Section IV.

V.   Commerce's Determination that Solar Cells Are Not
     Substantially Transformed When Assembled Into Panels Is
     Supported by Substantial Evidence.

        Next, Plaintiff Kyocera argues that the Taiwanese

cells used to assemble Kyocera's solar panels in Mexico are

substantially transformed in Mexico, such that they cannot be

assessed antidumping liability as products of Taiwan.[71]

        Here, as in Solar I PRC, Commerce employed the

substantial transformation test that is the agency's "usual

starting point" when deciding which country's foreign market

should provide the basis for the antidumping liability of

products produced in multiple countries.[72]  Using this test,

Commerce found that (1) solar cells and panels are within the

same class or kind of merchandise; (2) solar panel assembly does

not change the nature or use of the product's essential

component, the solar cell; and (3) solar panel assembly does not

constitute substantial or sophisticated processing of the

constituent solar cells.[73]  Accordingly, Commerce concluded that,

---

[71] See Kyocera's Br., ECF Nos. 29 & 30, at 18-23; see also id.
at 7.

[72] Solar II Taiwan I&D Mem. cmt. 1 at 18; compare id. at 19-21,
with Solar I PRC Scope Clarification Mem., Consol. Ct.
No. 15-00067, ECF No. 58-3 at Tab 1 Ex. 2, at 8 (unchanged in
Solar I PRC AD I&D Mem. cmt. 1 at 6-7).

[73] Solar II Taiwan I&D Mem. cmt. 1 at 19-21 (explicitly also
relying on the analysis conducted for the same class/kind of
merchandise in Solar I PRC).

"consistent with [the] determination in Solar I [PRC]," panel
assembly does not substantially transform the constituent solar
cells so as to change the cells' country-of-origin.[74]

Kyocera argues that Commerce should have instead
concluded that solar cells *are* substantially transformed when
assembled into panels in Mexico, such that a solar panel's
country-of-origin for antidumping purposes should be the country
in which the panel is assembled, rather than the country where
the constituent cells are produced.[75]  But Kyocera does not
directly challenge the factors that Commerce has chosen to use
for determining whether components produced in a country
different from where they are then incorporated into a finished
product are so transformed in the exporting country as to
justify an assessment of antidumping liability based on normal
values calculated in the market of ultimate assembly, rather

---

[74] See id.; see also Solar I PRC Scope Clarification Mem.,
Consol. Ct. No. 15-00067, ECF No. 58-3 at Tab 1 Ex. 2, at 8
("[W]here solar cell production occurs in a different country
from solar module assembly, the country-of-origin of the solar
modules/panels is the country in which the solar cell was
produced.") (unchanged in Solar I PRC AD I&D Mem. cmt. 1
at 6-7); Solar II PRC AD I&D Mem. cmt. 1 at 15 ("[Commerce]
determined in [Solar I PRC] that the solar cell [is] the
essential active component of the module, [and] that assembly of
cells into modules [does] not constitute substantial
transformation such that the assembled module could be
considered a product of the country of assembly . . . .")
(citation omitted).

[75] See Kyocera's Br., ECF Nos. 29 & 30, at 7, 18-23.

than the market of component production.[76]

Instead of making an argument about the reasonableness of the factors of analysis that Commerce actually employed here, Kyocera argues that Commerce should have used a different test, analogizing this case to country-of-origin analyses undertaken by different agencies in contexts unrelated to antidumping.[77] But Customs' country-of-origin determinations, made pursuant to and in furtherance of entirely different statutory authority, are inapposite to the issue presented here.[78]

---

[76] See id.

[77] See id. at 19-21 (arguing that Commerce should have used the country-of-origin test applied by the predecessor to U.S. Customs & Border Protection ("Customs") in Koru N. Am. v. United States, 12 CIT 1120, 701 F. Supp. 229 (1998), enforcing country-of-origin marking requirements under 19 U.S.C. § 1304 (1982), see Koru, 12 CIT at 1125-26, 701 F. Supp. at 233-34); id. at 22-23 (arguing that Texas Instruments, Inc. v. United States, 681 F.2d 778 (CCPA 1982), in which the court reviewed Customs' interpretation of 19 C.F.R. § 10.177(a) (1982), relating to country-of-origin determinations for purposes of the U.S. Generalized System of Preferences, see Texas Instruments, 681 F.2d at 781-82, constitutes "binding authority" in this case).

[78] See Certain Cold-Rolled Carbon Steel Flat Products from Argentina, 58 Fed. Reg. 37,062, 37,065 (Dep't Commerce July 9, 1993) (notice of final determination of sales at less than fair value) ("Cold-Rolled Steel from Argentina") (explaining that the statutory provisions governing Customs' country-of-origin determinations are separate from those governing Commerce's antidumping determinations, such that imported products may be determined by different agencies to have different origins for different statutory purposes); see also, e.g., Wax & Wax/Resin Thermal Transfer Ribbon from the Republic of Korea, 69 Fed. Reg. 17,645, 17,648 (Dep't Commerce Apr. 5, 2004) (notice of final
(footnote continued)

Here, Commerce exercised its discretion to use the

test that it had previously established for determining which

country will be used to calculate normal values for antidumping

duty assessment when products are manufactured in multiple

countries.[79]  Kyocera neither addresses this particular analysis

nor makes any specific argument as to why it was not reasonable

---

determination of sales at not less than fair value) ("Ribbon
from Korea") ("As [Commerce] has stated on numerous occasions,
[Customs] decisions regarding substantial transformation and
customs regulations . . . are not binding on [Commerce], because
we make these decisions with different aims in mind (e.g.,
anticircumvention).") (citation omitted); Stainless Steel Round
Wire from Canada, 64 Fed. Reg. 17,324, 17,327 (Dep't Commerce
Apr. 9, 1999) (notice of final determination of sales at less
than fair value) ("[W]e reiterate that the disciplines of the
[World Trade Organization] Agreement on Rules of Origin that are
currently in effect under Article 2 of the Agreement simply do
not require us to apply the country-of-origin determinations
made by the Customs Service when making determinations in
[antidumping] proceedings.").

[79] See Solar II Taiwan I&D Mem. cmt. 1 at 19 (relying on Issues
& Decision Mem., Glycine from India, A-533-845, Investigation
(Mar. 28, 2008) (adopted in 73 Fed. Reg. 16,640 (Dep't Commerce
Mar. 28, 2008) (notice of final determination of sales at less
than fair value)) ("Glycine from India") at cmt. 5); see Glycine
from India cmt. 5 at 5-6 ("The Department applies, as
appropriate, the following criteria in determining whether
substantial transformation occurs, thereby changing a product's
country of origin [for antidumping purposes]: 1) whether the
processed downstream product falls into a different class or
kind of product when compared to the upstream product,
2) whether the essential component of the merchandise is
substantially transformed in the country of exportation,
and 3) the extent of processing.") (citing Ribbon from Korea,
69 Fed. Reg. at 17,647; Erasable Programmable Read Only Memories
(EPROMs) from Japan, 51 Fed. Reg. 39,680, 39,692 (Dep't Commerce
Oct. 30, 1986) (final determination of sales at less than fair
value)).

for the agency to apply its usual test in this case.[80]  Nor does

Kyocera present any argument, or point to any record evidence,

to suggest that Commerce's conclusions in applying the three

factors of its substantial transformation test[81] to the evidence

here[82] do not comport with a reasonable reading of the

evidentiary record.[83]

---

[80] See Kyocera's Br., ECF Nos. 29 & 30, at 18-23.

[81] See supra note 79 (quoting and providing relevant citations
for Commerce's statement of the factors employed in its
substantial transformation test).

[82] See supra note 73 and accompanying text (summarizing and
providing relevant citation for Commerce's evidentiary
findings).

[83] See supra Standard of Review Section.  Kyocera attempts to
analogize this case to Diamond Sawblades Mfrs.' Coalition
v. United States, Slip Op. 13-130, 2013 WL 5878684 (CIT Oct. 11,
2013), Kyocera's Br., ECF Nos. 29 & 30, at 21-22, where the
court affirmed Commerce's determination that, with respect to
the class/kind of merchandise containing diamond sawblades, "the
essential quality of the [finished] product is not imparted
until the [components] are attached to create a finished
[diamond sawblade]," Diamond Sawblades, 2013 WL 5878684 at *10-
11.  But the court's unrelated decision that Commerce reasonably
weighed the particular evidentiary record in a different case,
concerning a different class/kind of merchandise, has no bearing
on whether Commerce's factual determinations with respect to the
products in this case are reasonably supported by the specific
evidentiary record presented here.  And to the extent that
Kyocera simply invites the court to re-weigh the evidence to
conclude that the process of panel assembly does substantially
transform the solar cells used in panel production,
see Kyocera's Br., ECF Nos. 29 & 30, at 20-23, it is not the
court's providence to do so. See, e.g., Jiangsu Jiasheng
Photovoltaic Tech. Co. v. United States, __ CIT __,
121 F. Supp. 3d 1263, 1272 (2015); Pakfood Pub. Co. v. United
States, 34 CIT 1122, 724 F. Supp. 2d 1327, 1348 (2010).

        Accordingly, this case presents no basis to disturb
Commerce's factual findings that (1) solar cells and panels are
within the same class or kind of merchandise; (2) solar panel
assembly does not change the nature or use of the product's
essential component, the solar cell; and (3) solar panel
assembly does not constitute substantial or sophisticated
processing of the constituent solar cells.[84]  Nor do the parties
present a basis to disturb the agency's consequent conclusion
that the cell is not substantially transformed in the process of
panel assembly so as to change the cell's country-of-origin,
pursuant to Commerce's usual substantial transformation test in
the antidumping context.

VI.  Assessment of Antidumping Duties Based on the Full Value of
     Solar Panels Assembled in Third Countries from Taiwanese
     Cells

        Plaintiffs also challenge Commerce's decision to apply
antidumping duties to the full value of solar panels assembled
in other countries from cells produced in Taiwan, rather than
only the value of the constituent Taiwanese cells.[85]  But as

---

[84] Solar II Taiwan I&D Mem. cmt. 1 at 19-21.

[85] SunEdison's Br., ECF Nos. 32 & 33, at 10, 54-56; Kyocera's
Br., ECF Nos. 29 & 30, at 8, 15-16, 25-26; see Solar II Taiwan
I&D Mem. cmt. 1 at 24 n.80 ("[W]ith regard to [the] argument
that [Commerce] should take into consideration the processing
done in the country that produces the cell and the country that
produces the module, laminate or panel, and then only apply
                                          (footnote continued)

explained in the Solar II PRC opinion, Commerce previously had a

reasonable policy of applying antidumping duties to the full

value of merchandise that is manufactured in part in countries

other than the subject country, because the statute requires

that Commerce assess such duties "in an amount 'equal to the

amount by which the foreign market value [now referred to as

'normal value'] of the merchandise [i.e., the entire finished

product] exceeds the United States price of the merchandise.'"[86]

---

[antidumping] duties to the portion of the processing that was
done in Taiwan, we disagree.  Solar modules assembled in third-
countries using Taiwanese solar cells are covered by the scope
of the [Solar II Taiwan] investigation, no matter the amount of
processing done in the third country.  Thus the full value of
these solar modules [is] subject to . . . applicable antidumping
duties.").

[86] Cold-Rolled Steel from Argentina, 58 Fed. Reg. at 37,065
(quoting predecessor to 19 U.S.C. § 1673e (requiring assessment
of antidumping duties "equal to the amount by which the normal
value of the merchandise exceeds the export price (or
constructed export price) of the merchandise")); see also Large
Newspaper Printing Presses and Components Thereof, Whether
Assembled or Unassembled, from Germany, 61 Fed. Reg. 38,166,
38,171 (Dep't Commerce July 23, 1996) (notice of final
determination of sales at less than fair value) ("LNPPs from
Germany") ("[A]ny interpretation [of the law] which sought to
limit the application of antidumping duties . . . to the foreign
content [attributable solely to a particular country] would be
inconsistent with [Commerce]'s statutory mandate to assess
antidumping duties on the extent to which the normal value . . .
(previously referred to as 'foreign market value') exceeds the
export price (previously referred to as 'United States price').
Application of antidumping duties only on [a particular
country's partial] processing or content portion of the import
might mean that the margin of dumping would not be fully
offset.") (citing Certain Corrosion-Resistant Carbon Steel
Products from Canada, 58 Fed. Reg. 37,099 (Dep't Commerce
                                             (footnote continued)

As Commerce had previously explained, because the foreign market value of the finished foreign like product is not necessarily subdivisible, "[a]pplication of antidumping duties only on [a particular country's partial] processing or content portion of the import might mean that the margin of dumping would not be fully offset."[87]

But as also discussed in the Solar II PRC opinion, this policy of assessing antidumping duties on the full value of finished products was also coupled with Commerce's policy of calculating normal value using foreign like products in the country where most of the essential production of the subject merchandise took place.[88]  Because the statute requires a fair comparison between the U.S. export price of the subject merchandise and the normal value of the foreign like product,[89] Commerce had, prior to its decisions in Solar II PRC and Solar II Taiwan, reasonably assessed antidumping duties on the

---

July 9, 1993) (final determination of sales at less than fair value), aff'd, In the Matter of Certain Corrosion-Resistant Carbon Steel Products from Canada, USA-93-1904-03 (Binational Panel under the United States-Canada Free Trade Agreement Oct. 31, 1994)); Solar II PRC Slip Op., Slip Op. 16-56, Consol. Ct. No. 15-00067, ECF No. 98, at 32-35, 47-48.

[87] LNPPs from Germany, 61 Fed. Reg. at 38,171.

[88] Solar II PRC Slip Op., Slip Op. 16-56, Consol. Ct. No. 15-00067, ECF No. 98, at 31-33, 38-39, 42-44.

[89] 19 U.S.C. § 1677b(a)(1).

full value of finished products after calculating dumping
margins using foreign normal values from the same market as that
where most of the actual manufacturing of the subject
merchandise occurred.[90]

Given this policy, Commerce reasonably determined to
assess antidumping duties pursuant to the Solar II Taiwan order
on the full value of the solar panels produced/imported by the
Plaintiffs here, because it is undisputed that at least fifty
percent of the production costs of Plaintiffs' solar panels were
incurred in the production of the panels' constituent cells in
Taiwan.[91]

---

[90] Solar II PRC Slip Op., Slip Op. 16-56, Consol. Ct.
No. 15-00067, ECF No. 98, at 43-44.

[91] See SunEdison's Br., ECF Nos. 32 & 33, at 10, 54-56 (arguing
that Commerce "must limit the collection of antidumping duty
deposits and assessments to the value of Taiwanese-origin
[solar] cells in the module," without disputing that the
majority of a solar panel's production costs are incurred in the
production of the constituent cells); Kyocera's Br., ECF Nos. 29
& 30, at 5, 8, 15-16, 25-26 (essentially same).  Kyocera makes
an argument regarding the value added by panel assembly as
compared with the market value of the individual cells,
Kyocera's Br., ECF Nos. 29 & 30, at 5, 16, but as Commerce has
explained, the agency is concerned with where the costs of
production are incurred, rather than percentages of value added,
because "we are primarily concerned with where [most of] the
actual manufacturing is occurring"; LNPPs from Germany, 61 Fed.
Reg. at 38,168; see also Cold-Rolled Steel from Argentina,
58 Fed. Reg. at 37,065 (explaining that antidumping liability is
not susceptible to subdivision using the market values of a
finished product's constituent parts, because "[antidumping]
duties are not an assessment against value," but are rather
"determined by the amount of [ultimate] price discrimination
                                          (footnote continued)

But as the court also held in Solar II PRC, Commerce deviated from its prior policy by determining, in Solar II PRC and also here in Solar II Taiwan, that solar panels assembled in China from cells produced elsewhere are to be assessed antidumping duties based on a comparison to normal values calculated for China, rather than the market where most of the production of the panels (i.e., cell-production) took place.[92] Because Commerce neither discussed nor reconciled this aspect of its Solar II PRC and Solar II Taiwan scope decisions with the agency's prior policy and reasoning, remand is necessary for the agency to do so.[93]   The outcome of these remand proceedings will bear directly on the reasonableness of Commerce's approach to antidumping duty assessment here.

Commerce's Solar II PRC exception for solar panels assembled in China from non-Chinese cells (which is incorporated

---

. . ., not by the value of the good").   In any event, even the evidence regarding the percentage of value added by panel assembly that Kyocera relies on does not dispute that a majority of the value of a solar panel resides in the constituent cells. See Kyocera's Br., ECF Nos. 29 & 30, at 5 (citing [Kyocera's] Req. for Scope Determination re Solar Prods. from Mexico, Certain Crystalline Silicon Photovoltaic Products from Taiwan, A-583-853, Investigation (Sept. 15, 2014), reproduced in App. to Pl.'s Rule 56.2 Mem. in Supp. of J. on the Agency R., ECF Nos. 34 (conf. version) & 35 (pub. Version) at App. 2, at 4).

[92] Solar II PRC Slip Op., Slip Op. 16-56, Consol. Ct. No. 15-00067, ECF No. 98, at 38-39, 45-46.

[93] Id.; see supra Discussion Section IV.

into the <u>Solar II Taiwan</u> scope[94]) seemingly abandons the agency's
reasonable prior policy, and thereby removes that policy's
explanatory power with respect to Commerce's decision here.   In
the absence of such explanation, Commerce's conclusory statement
that antidumping duties will be assessed pursuant to <u>Solar II
Taiwan</u> on the full value of solar panels assembled in third
countries from Taiwanese cells simply because such panels "are
covered by the scope of the [<u>Solar II Taiwan</u>] investigation, no
matter the amount of processing done in the third country,"[95] is
by itself insufficient to address Plaintiffs' arguments.[96]

      Thus how Commerce addresses this concern on remand in

---

[94] <u>See, e.g.</u>, <u>Solar II Taiwan I&D Mem.</u> cmt. 1 at 23.

[95] <u>Id.</u> at 24 n.80.

[96] <u>See</u> <u>Solar II PRC Slip Op.</u>, Slip Op. 16-56, Consol. Ct. No. 15-
00067, ECF No. 98, at 24-25 (noting that it is well-established
that the scope of an antidumping order is defined by two
separate inquiries – (1) is the product within the relevant
class/kind of merchandise? and (2) did the product originate in
the country covered by the order?) (relying on <u>Cold-Rolled Steel
from Argentina</u>, 58 Fed. Reg. at 37,065 (relied on by Commerce in
<u>Solar II Taiwan I&D Mem.</u> cmt. 1 at 18 n.52); <u>3.5" Microdisks and
Coated Media Thereof from Japan</u>, 54 Fed. Reg. 6433 (Dep't
Commerce Feb. 10, 1989) (final determination of sales at less
than fair value) (relied on in <u>Cold-Rolled Steel from Argentina</u>,
58 Fed. Reg. at 37,065); and <u>Solar II Taiwan I&D Mem.</u> cmt. 1
at 18 ("In determining the scope of the investigation,
[Commerce] must not only address . . . the products intended to
be covered by the scope, but also determine the country-of-
origin of the solar products at issue.")).   In the absence of
the explanatory power of its prior policy, Commerce's
explanation here appears to conflate these two separate
inquiries.

Solar II PRC, and here, will also have implications for the reasonableness of its decision with respect to this issue.

VII. <u>Commerce's Treatment of Sales of Taiwanese Cells to Third-Country Panel Assemblers For Export to the United States</u>

Finally, SunEdison challenges Commerce's treatment of respondents' "sales to third countries for which [the Taiwanese solar cell producers/exporters] ha[d] knowledge that the merchandise was ultimately destined for the United States."[97]  A significant proportion of such sales, however, appear to have been sales of Taiwanese solar cells to panel assemblers in China,[98] which Commerce specifically excluded as non-subject merchandise pursuant to the determinations that are remanded here and in Solar II PRC.[99]  The court will therefore defer its

---

[97] SunEdison's Br., ECF Nos. 32 & 33, at 4 (quoting [Commerce's] Quantity & Value Questionnaire, <u>Certain Silicon Photovoltaic Products from Taiwan</u>, A-583-853, Investigation (Jan. 29, 2014), <u>reproduced in</u> [Pub.] App. to Br. of Pl. [SunEdison] in Supp. of Pl.'s Mot. for J. Upon the Agency R., ECF No. 37-1 at Tab 22, at Attach. I ("Format for Reporting Quantity & Value of Sales")); <u>see id.</u> at 29-49 (presenting this challenge); <u>see also id.</u> at 27 ("Commerce's respondent selection was faulty because Taiwan respondents reported indirect U.S. sales of cells through China as 'subject merchandise' in accordance with Commerce's instructions, yet Commerce in the end removed those transactions as 'non-subject' merchandise under its final scope determination[, and t]his eliminated many of their reported sales.") (footnote omitted) & 49-54 (expanding this argument).

[98] <u>See</u> SunEdison's Br., ECF Nos. 32 & 33, at 34-36.

[99] <u>Solar II Taiwan I&D Mem.</u> cmt. 1 at 23 ("Neither Taiwanese cells used to assemble solar modules in the PRC nor those solar modules are covered by the scope of this investigation.  Rather,
                                              (footnote continued)

review of Commerce's treatment of sales of Taiwanese cells to third-country panel assemblers that were reported as destined for export to the United States until the issues remanded here are resolved, and the scope of these proceedings is finalized.

### CONCLUSION

For all of the foregoing reasons, the Solar II Taiwan final scope determination is remanded to Commerce for reconsideration in accordance with this opinion.  Commerce shall have until August 15, 2016, to complete and file its remand results.  Plaintiffs shall have until September 6, 2016, to file comments, and the agency and Defendant-Intervenor shall then have until September 20, 2016, to respond.

It is SO ORDERED.

                              /s/ Donald C. Pogue
                       Donald C. Pogue, Senior Judge


Dated: June 14, 2016
       New York, NY

---

solar modules assembled in the PRC using Taiwanese cells are within the scope of, and therefore subject to, the [Solar II PRC] AD and CVD investigations as Chinese modules . . . ."); Solar II PRC AD I&D Mem. cmt. 1 at 28 ("[S]olar cells assembled in China using solar cells manufactured in Taiwan are subject to [the Solar II PRC exception for panels assembled in China from non-Chinese inputs] and not [Solar II Taiwan].") (citation omitted); see supra Discussion Sections IV & VI; Solar II PRC Slip Op., Slip Op. 16-56, Consol. Ct. No. 15-00067, ECF No. 98, at Discussion Section IV.